Scrap Iron & Steel Import Corporation v. Commissioner.
Scrap Iron & Steel Import Corp. v. Commissioner
Docket No. 86945.
United States Tax Court
T.C. Memo 1965-153; 1965 Tax Ct. Memo LEXIS 176; 24 T.C.M. (CCH) 804; T.C.M. (RIA) 65153; June 4, 1965
*176 Petitioner has failed to establish the existence of a joint venture for the importation of certain materials from Germany in 1952, and is thus taxable on the entire proceeds received therefrom. Sol Charles Levine, for the petitioner. Michael D. Weinberg and Paul H. Frankel, for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in petitioner's income tax for the fiscal year ended September 30, 1952, in the amount of $74,066.01. The following two fiscal years are involved solely because of net operating loss carrybacks. The sole issue for decision is the treatment of $272,913.26 which petitioner deducted as "Participation Payable in Iron and Pipe Joints." The deductibility of this item depends upon whether or not petitioner establishes the existence of a joint venture. Other issues have been conceded by petitioner. Findings of Fact Some of the facts have been stipulated and are incorporated therein by this reference. Petitioner is a New York corporation located at 500 Fifth Avenue in New York City. Its tax returns for the fiscal years ended September 30, 1952, 1953, and 1954 were prepared *177 on an accrual basis of accounting and filed with the district director of internal revenue, Upper Manhattan district, New York. Petitioner was incorporated on January 30, 1948. Its president and sole shareholder has always been Tess Friedeberg (sometimes hereinafter referred to as Tess); its treasurer Adolf Friedeberg (sometimes hereinafter referred to as Adolf), Tess' husband; and its secretary until 1962 was David J. Lewis (sometimes hereinfater referred to as Lewis). Foreign Assets Realization Corporation (sometimes hereinafter referred to as Foreign Assets, New York) was incorporated under the laws of New York prior to October 1, 1951. Its stock has always been owned entirely by petitioner; it kept no books and records; and, its transactions were recorded on the petitioner's books and were treated by petitioner as petitioner's own transactions. Its officers were the same as those of the petitioner; it was merely a dummy-subsidiary which acted on behalf of petitioner. In the years 1948, 1949, 1950, and 1951, petitioner was engaged in exporting scrap iron and steel from Germany and selling the same to the Carnegie Illinois Steel Co. under licenses issued by the Joint Export *178 and Import Agency of the Allied High Commission for the control of Germany. In about October 1950, this agency turned over to the de facto German government, as then constituted, the control of the exportation and licensing of the export of scrap iron and steel from Germany subject to a Joint Steel Control Board of the Allied High Commission. Petitioner in the name of Foreign Assets, New York, at that time had valid licenses for the exportation of 150,000 tons of scrap iron and steel from Germany, which had been duly approved by the Joint Export and Import Agency. Thereafter, the German agency charged with the supervision of exports changed the rules and regulations governing export, as a result of which only 35,000 tons were actually exported by petitioner. Because of the change of such rules and regulations, 15,000 tons which had been contracted for and approved for export and was ready for shipment remained unshipped, and 100,000 tons, although licensed by the Joint Export and Import Agency and contracted for, was not approved for shipment by the successor German agency. From October 1950 through February 1952, petitioner endeavored to obtain shipping permits, loading permits, *179 and waivers of the new rules and regulations adopted by the German agencies. As a result of petitioner's activities, an agreement was reached between the United States State Department and the Chancellor of the Federal German Republic that the 15,000 tons might be exported outside of quotas then established. Petitioner then endeavored to obtain the export licenses and shipping permits for said 15,000 tons, but found that the rules and regulations of the various departments had again been changed, and required domestic (German) shippers to furnish to German mills a specific amount of scrap for each ton exported or licensed to be exported. Finding the rules and regulations again changed, petitioner alleged that it and its German suppliers were being discriminated against by cartels which had been revived despite the fact that they had been ordered to dissolve. This allegation received international publicity. In a letter dated December 17, 1951, on the stationery of "Minerva S. A., Panama, R. P.," (sometimes hereinafter referred to as Minerva) addressed to Lewis, a proposal was made by two representatives of Minerva, Zweifel and Erlach, whereby Minerva, as a "Trustee," would endeavor *180 to work out a "compromise" between all the parties involved. This letter recited, in part, that it was Minerva's view * * * that you have been dealing with the wrong people and that these people with whom you have been dealing are not within the circle which influences the actions of the various concerned bodies due to their standing in the industry. By terms of the letter, Minerva proposed to "arrange" for the supply of materials to produce "finished materials," "official sanction" for their exportation, a price low enough for petitioner to make a profit "sufficient to compensate each of us for our work, services, expenses and other compensations incident to working the same out." Petitioner's share of the profits was to be $165,000, with any excess to be "paid over to us or held by you as Trustee for us, subject to our direction as to payment." The letter stated that Minerva proposed to make informal arrangements, after which petitioner would take the formal action necessary to consummate the transactions. The letter further proposed that petitioner organize in Switzerland a corporation or corporations which shall receive the excess proceeds and shall be held there as Trustee, *181 distribution to be made as may be directed, pending which you shall execute your promissory notes in negotiable form to be held by a Trustee. In addition, it was to be understood that you shall at no time require us nor shall we be required to account for disposition of any proceeds which you hold in our behalf nor shall you be entitled to know or to receive information as to who, if anyone, shares therein. It is to be understood between us that we merely act as Trustee and are using our abilities to render solution of this problem possible without anyone being compromised or embarrassed or suffering a monetary or economic loss. This letter was initialed as accepted by Lewis on behalf of Foreign Assets, New York. After the date of the above letter, Foreign Assets, New York, was able to obtain 15,000 tons of scrap which was fabricated into 9,000 tons of finished tubing and casing, and sold to Shell Oil Company for a price $437,913.26 in excess of cost. On behalf of petitioner, Lewis executed two promissory notes dated September 22, 1952, each in the amount of $136,456.63, payable to "Ourselves" one year later. He delivered these notes to petitioner's accountant. No payment *182 has ever been made by petitioner to Minerva, its representatives or agents. Opinion The issue for our decision is basically whether or not petitioner is taxable on the entire amount of profit from the importation and sale of certain materials to the Shell Oil Company in 1952. Petitioner contends that only a portion of the profit is includable in its income because it had entered into a joint venture with a Panamanian corporation, Minerva, S. A. Respondent contends that petitioner has failed to show, both as a matter of fact and of law, the existence of a joint venture and is not entitled to deduct the amount it claims was payable to Minerva. The record in this case reads somewhat like an episode in a rather pedestrian paperback mystery story of international finance and intrigue. Respondent's characterization of the Minerva representatives, Zweifel and Erlach, as "mystery people" and "facilitators," reflects the impression created by petitioner's presentation herein. Though the situation is intriguing, the most relevant portions, like the bulk of an iceberg, are not to be seen in the record before us. Petitioner has completely failed in its burden of proving not only the existence *183 of a joint venture, but also the proper accrual of the amount it contends was payable to the joint venturer. Lewis and an accountant, Jacobson, were petitioner's only witnesses. Jacobson's testimony served principally to corroborate certain book entries which he had made. All of the information upon which he based these entries was furnished to him by petitioner's officers. Thus the only witness with any personal knowledge of the Minerva transactions was Lewis, and we do not find his testimony sufficient, either in credibility or content, to establish the existence of a joint venture with Minerva, even when supplemented by the documentary evidence introduced by petitioner. As documentary substantiation petitioner offers what purports to be an agreement with Minerva whereby Minerva would "facilitate" the export of materials by petitioner's subsidiary at a handsome profit, with no questions to be asked. Petitioner was to form a Swiss corporation to hold Minerva's share of the above profits. Petitioner has introduced into evidence several ledger sheets which purport to reflect transactions by and with "F.A.R.C. (Establishment) of Vaduz,", (sometimes hereinafter referred to as Vaduz), *184 and a signature authorization card from a New York bank in the name of Vaduz. Petitioner contends that Vaduz is a Liechtenstein corporation formed pursuant to the agreement, but offers no evidence to show that it was anything other than a domestic depository for petitioner's own funds. On the basis of the above evidence and the testimony of Lewis, petitioner would have us believe that Minerva was a joint venturer in the transaction herein, and that only the first $165,000 of net income was taxable to petitioner. There are simply too many "loose ends" and "gaps" in petitioner's presentation for us to accept its contention. Other than the "agreement" on Minerva stationery, there is nothing except Lewis' testimony to indicate that Minerva even existed. But even assuming that the Minerva "mystery people" did exist and did negotiate on behalf of petitioner, there is no evidence of a joint venture. Although the record is not clear, it would appear that not only did petitioner fail to make any payments to Minerva, but its officers appear to have appropriated Minerva's entire "share" to their own uses, [1] with nothing but book entries to indicate to whom the original proceeds had been *185 allocated upon receipt. This lack of payment militates against the existence of a joint venture. No explanation has been given as to why petitioner treated the entire proceeds as its own. Petitioner contends that it set up a trust for the benefit of Minerva and formed Vaduz as a method of making payment to Minerva. We note, however, that the trust res consisted solely of two promissory notes, payable to "Ourselves," and a bank account. The notes were allegedly delivered to Jacobson, petitioner's accountant, with a list of securities attached (which list was not produced at trial). The signature authorization card for the Vaduz bank account indicates that Lewis and the Friedebergs, petitioner's officers, were the only authorized signatories. Especially in the absence of payment, we view these as little more than paper transactions which were completely lacking in substance. Even if petitioner did form a Liechtenstein corporation (which there is no evidence other than Lewis' testimony and petitioner's own book entries to *186 support), it retained complete control over all of that corporation's activities and finances, and ultimately treated all funds as its own. The testimony offered by petitioner is insufficient to make up for the dearth of objective evidence offered by it. Adolf and Tess, who were petitioner's treasurer and president, did not testify despite the fact that Tess, petitioner's sole shareholder, appears to have been available. [2] From this we infer that their testimony would have been unfavorable to petitioner. , affd. (C.A. 10, 1947).
Coming finally to Lewis' testimony, upon which petitioner's entire prima facie case depends, we find it neither substantively adequate nor even reasonably credible. It was internally inconsistent, evasive and, in brief, not worthy of belief on crucial points. Even assuming that he did meet with the Minerva representatives, we doubt that he (or the other officers *187 of petitioner) intended to enter into a joint venture with them. The subsequent defalcations confirm this. Payment has never been made to Minerva, and petitioner has established no basis for the accrual of any part of the net profits in 1952 or any subsequent year. Thus, Decision will be entered for the respondent. Footnotes
1. Lewis so testified at trial. Prior to this, in February 1961, he submitted a signed statement to the United States Treasury Department to the same effect.↩
2. At one point during the trial, she delivered pages of petitioner's books and records to petitioner's counsel outside of the courtroom; yet no explanation was given for her failure to testify.↩